# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CIVIL CASE NO. 1:20-cv-00105-MR-WCM

| | |
|---|---|
| A.W. MUNDAY,<br><br>                  Plaintiff,<br><br>        vs.<br><br>LEES-MCRAE COLLEGE, a North<br>Carolina Corporation,<br><br>           Defendant.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Alongside, to the right:

**MEMORANDUM OF DECISION AND ORDER**

**THIS MATTER** is before the Court on the Defendant's Motion for Summary Judgment. [Doc. 69].

## I.    PROCEDURAL BACKGROUND

The Plaintiff John Doe, later identified as Andrew Munday, brought this action against Lees-McRae College ("LMC"), Lee King, Jon Driggers, and Joshua Gaisser, asserting claims for violations of Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act") and Title III of the Americans with Disabilities Act of 1990 (the "ADA"), as well as state-law claims for negligence, intentional and negligent infliction of emotional distress, and fraud in the inducement/breach of contract. [Doc. 13].

The Defendants filed a Rule 12(b)(6) motion to dismiss, which the Court granted in part and denied in part. Specifically, the Motion was granted with respect to the Plaintiff's state-law claims. The Motion was also granted with respect to the Plaintiff's claims against individual defendants King, Driggers, and Gaisser. The Motion was denied with respect to the Plaintiff's claims against LMC under the ADA and Rehabilitation Act. With respect to these federal claims, the Court held that the Plaintiff had stated claims regarding a failure to accommodate related to a February 6, 2019 disciplinary hearing, based on allegations that the Plaintiff had requested: "an explanation of what was going on, expressed that he needed more time and assistance in responding and, specifically, asked to have the Spanish Instructor attend the hearing as a witness." [Doc. 25 at 11, report and recommendation adopted, Doc. 30]. This Court also determined that the Plaintiff's claims based on an exclusion theory could proceed, because the Plaintiff had adequately alleged that disciplinary proceedings against him were motivated by his requests for assistance with "emotional disabilities," and not misconduct. [Id. at 12].[1] After the Court entered a Pretrial Order and Case Management Plan [Doc. 63], the parties conducted discovery through

_____

[1] The Plaintiff was subsequently allowed to amend his complaint to assert additional factual allegations and to correct misnumbered paragraphs. [Docs. 58, 60].

2

March 7, 2022.  Thereafter, LMC filed the present Motion for Summary Judgment.  [Doc. 69].  The Plaintiff filed a Response [Doc. 80], and LMC filed a Reply [Doc. 81].  The Court held a hearing on the Defendant's Motion on July 15, 2022.

Having been fully briefed and argued, this matter is now ripe for disposition.

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is material only if it "might affect the outcome of the suit under the governing law."  Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

3

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" in the record. Fed. R. Civ. P. 56(c)(1)(a); see also Celotex, 477 U.S. at 324. Courts "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." E. Shore Mkt. Inc. v. J.D. Assocs. Ltd., 213 F.3d 175, 180 (4th Cir. 2000) (citation omitted). The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255.

4

## III. FACTUAL BACKGROUND

The forecast of evidence (which is almost entirely undisputed) taken in the light most favorable to the Plaintiff is as follows. The Defendant Lees-McRae College ("LMC") is a private, four-year coeducational residential college. [Doc. 69-4: Gaisser Decl. Ex. B: 2018-19 Student Handbook at 6]. According to the Academic Code of Honor and Student Code of Conduct as published in the LMC Student Handbook, the hallmarks of LMC students are "academic achievement, professional skills and concern for humanity." [Id.]. All students are expected to act in a manner that does not infringe upon the rights and responsibilities of others, including by refraining from disruptive classroom behavior. [Id. at 7]. LMC "reserves the right to dismiss any student who proves to be a detriment to the welfare of the College and surrounding community." [Id. at 9]. Students are expected to maintain a high standard of conduct both on and off campus, and any student who behaves in a disorderly, disruptive or dangerous manner may be subjected to disciplinary action. [Id. at 14].

When a violation of the student code of conduct is alleged, the Assistant Dean informs the student of charges made against the student, conducts an informal hearing, and determines the appropriate sanction. [Id. at 9]. Complicated cases are heard by a panel. [Id.]. The Student Handbook

5

contains a description of the process, the accused student's rights, violations, potential sanctions, and options for appeals. [Id. at 9-20]. Students receive a "Notice of Charge" that briefly summarizes the process and directs the student to the Handbook for more information. [See Doc. 70-2: Gaisser Decl. Exs. C at 1, E at 1, J at 6]. Among other information about the procedure, the Handbook explains that students can bring witnesses. [Doc. 69-4: Gaisser Decl. Ex. B at 11].

The Plaintiff enrolled as a student at LMC as a freshman for the 2017-2018 academic year. Along with his application to LMC, the Plaintiff submitted a Medical History Report. In the portion of the Report asking, "Do you now have or have you ever had any of the following," the Plaintiff checked "yes" for "ADD/ADHD."[2] [Doc. 80-3: W. Munday Ex. 2].

Under LMC's policy,[3] any student with a disability who desires an accommodation is required to identify themselves, provide appropriate documentation, and request reasonable accommodations through the

---

[2] The term "ADD" refers to "attention deficit disorder," while "ADHD" refers to "attention-deficit/hyperactivity disorder." ADD is an older term used for what is now known as the inattentive type of ADHD. The term ADHD is now commonly used to describe both inattentive and hyperactive types. See https://www.webmd.com/add-adhd/childhood-adhd/add-vs-adhd (last accessed Nov. 22, 2022).

[3] This procedure is set forth in the Student Handbook, the Course Catalog, and on LMC's website. [Doc. 69-2: Beggs Dec. at ¶ 10].

6

designated Office of Disability Services (now called the Office of Accessibility Services). [Doc. 69-2: Beggs Decl. at ¶¶ 5, 10]. All documentation supporting the need for a disability-related accommodation must be from a qualified professional, clearly state a diagnosis and the current functional limitations of the condition, recommend accommodations, and state how the limitation will affect the individual in an educational setting. [Id.]. All students with questions about the process are directed to the Office of Disability Services. [Id. at ¶ 6].

The Plaintiff and his father, Warren "Buddy" Munday, were informed and reminded, both verbally and via email, of the requirement to request accommodations in writing on multiple occasions, by professors and administrators. [See Doc. 69-6: McGuire Decl. at ¶ 6 and Doc. 70-3: McGuire Decl. Ex. C; Doc. 70-1: Kokos Decl. Ex. A at 59, 64, 97, 115-16, 121]. The Plaintiff's advisor and LMC tutoring coordinator, Sue McGuire, informed the Plaintiff on multiple occasions that, if he needed to seek any accommodations or modifications for a learning disability, he would need to meet with Karen Robertson at the Office of Disability Services at the Burton Center for Student Success. [Doc. 69-6: McGuire Decl. at ¶ 6]. The Plaintiff was also told by Amy Anderson (Dean of the Business School and Plaintiff's advisor for his business major), Pamela Keystone (BUS 101 professor), Ken

7

Craig (ethics professor), and others that it is up to each student to self-disclose any specific issues or needs to Robertson. [Id.; Doc. 69-2: Beggs Decl. at ¶ 5; Doc. 70-1: Kokos Decl. Ex. A at 52, 59, 64, 97, 115-16, 121].

The Plaintiff did not follow this procedure or the instructions of his professors. [Doc. 69-2: Beggs Dec. at ¶ 8]. However, the Plaintiff and his father talked to several faculty members about his diagnosis. [Doc. 69-7: Munday Dep. at 22-24]. The Plaintiff's father referenced his son's ADHD "in virtually all correspondence with faculty and staff." [Doc. 80-3: W. Munday Decl. at ¶ 2].

On occasion, the Plaintiff's father emailed the Plaintiff's professors individually to request changes to grades or opportunities for extra credit or make-up work when the Plaintiff missed assignments or tests. In his emails, the Plaintiff's father requested that the Plaintiff's professors not tell the Plaintiff that his father was intervening on his behalf. [See, e.g., Doc. 70-1 Kokos Dec., Ex. A at 45-48, 131-40, 143-45, 162-66]. The Plaintiff's father concedes that, in terms of his learning needs, the Plaintiff "received all the tutoring and academic support he needed." [Doc. 80-3: W. Munday Decl. at ¶ 8].

The Plaintiff recalled requesting an accommodation in the form of "some extensions [of time] for work" from a professor, which he received.

8

[Doc. 69-7: Munday Dep. at 24-25]. The Plaintiff also received academic assistance from his guidance counselor, Dr. Laura Fero, who helped him schedule his classes, communicating directly with his professors and LMC administrators. [Doc. 80-2: Munday Decl. at ¶ 7]. Dr. Fero also referred the Plaintiff to Ms. McGuire, who assisted him on assignments and referrals to the Burton Center for Student Success. [Id.]. These referrals were not disability-specific accommodations, however, as all students attending LMC were eligible to use academic resources through the Burton Center and through Counseling Services in the Student Affairs Office. [See Doc. 69-2: Beggs Decl. at ¶ 3].

Despite the Plaintiff's failure to make any formal requests for accommodation, Karen Robertson, the Coordinator of Disability Services, reached out to the Plaintiff during the Spring 2018 semester and scheduled a meeting to discuss his needs. The Plaintiff, however, failed to show up to the meeting or submit any paperwork. [Doc. 70-1: Kokos Decl. Ex. A at 37-40].

In November 2017, during the Plaintiff's first semester at LMC, the Plaintiff visited a friend who resided in Tate Hall, a dormitory on the LMC campus. The Plaintiff reached a closing door, opened it, and entered the dorm. After entering, the Plaintiff was stopped by a resident assistant (RA),

9

who questioned the Plaintiff's presence in the building. The Plaintiff told the RA to leave him alone and walked away. [Doc. 80-2: Munday Decl. at ¶ 12]. The RA reported this incident to Joshua Gaisser, the Assistant Dean in charge of student conduct, claiming that the Plaintiff had overpowered the card lock and forced open the entrance to the dormitory. The RA reported that when the Plaintiff was told not to yank the door open or enter without a card, the Plaintiff swore at him and walked away. [See Doc. 69-4: Gaisser Decl. at ¶ 7]. Gaisser met with the Plaintiff on January 31, 2018, for a hearing regarding this incident. Gaisser found the Plaintiff responsible for violating the College's policy on unauthorized access and gave him an official disciplinary warning, which the Plaintiff signed. [Doc. 69-4: Gaisser Decl. at ¶ 8; Doc. 70-2: Gaisser Decl. Ex. C].

During his first semester at LMC, the Plaintiff also began having issues with members of the cafeteria staff. Like all dormitory students, the Plaintiff had a mandatory meals contract, which he used only on a limited basis because of his work schedule and frequent weekend departures. The Plaintiff took food as needed in the provided take-out boxes, as Jon Driggers, the Dean of Students, had advised him he could. [Doc. 80-2: Munday Decl. at ¶ 8]. A cafeteria manager, however, took issue with the Plaintiff's actions and began "stalking and harassing" him in the cafeteria, causing the Plaintiff

10

considerable anxiety and distress.  [Id. at ¶ 9].  The Plaintiff repeatedly went to Gaisser and asked him to intervene on the Plaintiff's behalf and "to broker an understanding with the cafeteria manager."  [Id.].  Gaisser, however, refused to help the Plaintiff in this regard.  [Id.].

On February 7, 2018, the cafeteria manager confronted the Plaintiff about again violating the cafeteria rules.  The Plaintiff cursed loudly, told the manager to get out of his face, and left the cafeteria, kicking the door open and taking cafeteria glassware and a bowl with him.  [Doc. 69-4: Gaisser Decl. at ¶ 9; Doc. 70-2: Gaisser Decl. Exs. D & E].  After leaving the cafeteria, the Plaintiff immediately met with Gaisser and reported that the Plaintiff told the cafeteria staff member to "get the fuck out of my face, bro" when approached by staff about the to-go box rule.  [Doc. 70-2: Gaisser Decl. Ex. E at 4].  The Plaintiff also said to Gaisser that "he [the staff member] was lucky he didn't get socked in the face."  [Id.].

As a result of his conduct in the school cafeteria, the Plaintiff was charged with violating the Code of Conduct, his second code violation since beginning at LMC.  [See Doc. 70-2: Gaisser Decl. Ex. C at 1, Ex. E at 1].  At a hearing held in February 2018, the Plaintiff was found responsible for the conduct violations by a disciplinary panel, and he was placed on probation

11

until the end of the Fall 2018 semester. [See Doc. 69-4: Gaisser Decl. at ¶ 12; Doc. 70-2: Gaisser Decl. Ex. E; Doc. 69-7: Munday Dep. at 35].

Two months after the hearing, in April 2018, the Plaintiff leaned on the edge of an already-cracked porcelain countertop in a bathroom of his dormitory, and the countertop broke. [Doc. 69-4: Gaisser Decl. at ¶ 13; Doc. 70-2: Gaisser Decl. Ex. F; Doc. 80-2: Munday Decl. at ¶ 13]. Gaisser performed an investigation and found that the Plaintiff was responsible for the damage. [See Doc. 69-4: Gaisser Dec. at ¶¶ 13-14]. After being assessed for the cost of the broken countertop, the Plaintiff accused Gaisser and residence staff of lying and trying to scam him, stating in an email: "Nice attempt at tring [sic] to scam me out of my money but it wont [sic] work!!" [Doc. 70-2: Gaisser Decl. Ex. F at 4]. The Plaintiff also passed a note under the door of a student whom he believed to have reported him that said, "You're a fag!" [Doc. 69-4: Gassier Decl. at ¶ 14; Doc. 70-2: Gaisser Decl. Ex. G; see also Doc. 69-7: Munday Dep. at 27-30, 88-96].

At the end of the Spring 2018 semester, when the students were preparing to leave campus, the Plaintiff was charged approximately $13 at the student bookstore when he returned a rental textbook in a significantly damaged condition. [Doc. 69-4: Gassier Decl. at ¶ 15; Doc. 70-2: Gaisser Decl. Ex. H]. The Plaintiff screamed at the store manager, and then at

12

Gaisser and Driggers when they tried to calm the Plaintiff after the incident. [Id.]. Gaisser and Driggers did not pursue conduct charges against the Plaintiff because the semester had ended. [Id.].

The Plaintiff's disruptive behavior continued through the Fall 2018 semester, including interrupting classes to make off-topic comments, vaping in class, and not turning in assignments. [Id. at ¶ 16]. Gaisser tried several times to meet with the Plaintiff to discuss his behavior, as it could result in a student conduct violation, but the Plaintiff avoided his meeting requests. [Doc. 69-4: Gassier Decl. at ¶ 16].

On January 31, 2019, Tim Shatley, a LMC faculty member who was auditing Dr. Rachel Chrane's Spanish 211 class, reported to Gaisser an incident that occurred the day before in class. Shatley reported hearing the Plaintiff ask a female student, identified in the record as K.H., "why she was being such a fucking cunt." When K.H. told the Plaintiff to be respectful, he told her to "stop being so cunty." [Doc. 69-10: Gaisser Dep. at 51-53; Doc. 70-2: Gaisser Decl. Ex. J at 8]. Shatley reported that the Plaintiff repeated this word and other abusive language a few more times. [Id.]. In response to the report, Gaisser asked K.H., Dr. Chrane, and four other potential witnesses in the class to provide an objective, detailed description of what had happened. [Doc. 69-10: Gaisser Dep. at 53, 54, 91-92]. According to

13

one statement, the Plaintiff and K.H. had claimed the same topic from a discussion list for a class assignment and disputed who chose it first. [Doc. 70-2: Gaisser Decl. Ex. J at 7]. When K.H. told the Plaintiff that they could check the list online to see who had selected it first, the Plaintiff called her a "cunt." [Id.]. K.H. replied that he could not speak to her that way and an argument began back and forth between K.H and the Plaintiff, in which K.H. complained about the Plaintiff's disruptive behaviors in class, including vaping, videotaping other students during class without permission, and speaking over other students about unrelated subjects. [Id.]. When Dr. Chrane intervened, the Plaintiff complained about K.H. being disrespectful toward him, and K.H. reported that the argument began after the Plaintiff called her a "cunt." [Id.]. When Dr. Chrane learned that this remark was made, she removed the Plaintiff from the room and spoke with him. However, when they returned to class, the Plaintiff continued to mock K.H. and asked if she was crying. [Id.]. Ultimately, Dr. Chrane changed the Plaintiff's seat. [Id.].

A second statement described the same course of events leading up to the Plaintiff's remark to K.H., but stated that the Plaintiff kept "calling her a c*nt and said "I hate your bullsh**" over and over again in front of the entire

14

class, and when the altercation ended, the Plaintiff rolled his eyes and said, "Oh now she's crying, typical." [Id. at 9].

Dr. Chrane sent an email to Gaisser with her own statement, clarifying that she intervened when she heard K.H. tell the Plaintiff that he needed to speak respectfully of others, but that she did not hear the initial remarks, including what caused the dispute. [Id. at 3]. Dr. Chrane also noted that the Plaintiff "murmured" an apology after they returned to the classroom from the hallway. [Id.].

Another statement submitted to Gaisser stated that Dr. Chrane had taken the Plaintiff out to the hallway a second time and urged him to apologize to K.H. again. [Id. at 10]. However, when they returned and the Plaintiff apologized, he included the statement, "some words are inappropriate to use regardless of how someone acts," which the witness perceived as blaming K.H. for the incident. [Id.]. Dr. Chrane subsequently confirmed that this statement was an accurate description of what happened. [Id.].

The Plaintiff admits that he "impulsively overreacted" to K.H.'s initial comments by asking her quietly "why are you acting like a c*nt," for which he immediately apologized. [Doc. 80-2: Munday Decl. at ¶ 15]. The Plaintiff described the incident as "so low key" that Dr. Chrane did not even hear the

exchange from another part of the room and did not report it as a conduct issue. [Id.]. The Plaintiff later testified that, during his conversation with Dr. Chrane in the hallway, she told him "something along the lines of they are trying to kick you out of here." [Doc. 69-7: Munday Dep. at 36].

On February 4, 2019, Gaisser sent the Plaintiff an email explaining that a disciplinary hearing would take place to determine whether the Plaintiff had engaged in a conduct violation based upon reports that "an altercation between you and another classmate allegedly occurred on Thursday afternoon in which you called this individual a variety of inappropriate words in a classroom full of people after she had requested you to stop." [Doc. 70-2: Gaisser Decl. Ex. J at 5]. The email provided the hearing date, time, and location and directed the Plaintiff to contact Gaisser with questions. [Id.]. Gaisser also had an assistant place the Notice of Charge under the door of the Plaintiff's residence the following day. [Id. at 6].

Later on February 4th, the Plaintiff approached Gaisser and asked him questions about the scheduled hearing. [Doc. 69-7: Munday Dep. at 36-37]. During this conversation, the Plaintiff asked Gaisser "what was going on with the situation," "if Ms. Chrane could be there," and "for some extra time," and that Gaisser "said no." [Id. at 37]. The Plaintiff did not recall explaining to Gaisser why he made these requests, and Gaisser testified that the Plaintiff

16

did not disclose his disability or explain that he was making any of these requests as an accommodation. [Id.; Doc. 69-10: Gaisser Dep. at 74, 101-04].

Gaisser met with Dr. Chrane and Dean of Faculty, Pam Vesely, at their request, to discuss the incident just before the hearing, at 2:30 p.m. on February 6, 2019. At this meeting, Dr. Chrane never expressed any plans, willingness, availability, or any desire to testify as a witness at the disciplinary hearing. [Doc. 69-10: Gaisser Dep. 72-73]. Neither Dr. Chrane nor Dr. Vesley mentioned the Plaintiff having ADHD to Gaisser at the meeting. [Id. at 71].

According to Dr. Chrane, the Plaintiff never asked her to attend the disciplinary hearing. [See Doc. 69-11: Chrane Dep. at 123-24]. The Plaintiff could not recall if he asked Dr. Chrane to be present at his disciplinary hearing. [Doc. 69-7: Munday Dep. at 38]. However, the Plaintiff believed that, had Dr. Chrane testified at the disciplinary hearing, she would have told the panel that "there was a little incident but it had been resolved, and that there wasn't any further issues, and there wasn't going to be any further issues." [Doc. 69-7: Munday Dep. at 117]. In the Plaintiff's opinion, "Ms. Chrane would have benefitted me a lot." [Id. at 119].

17

The February 6, 2019 disciplinary hearing was conducted by Joshua Gaisser and three other LMC administrators. [Doc. 69-4: Gaisser Dec. at ¶ 20]. After each participant introduced themselves, Gaisser explained that the panel was formed to hold conferences about serious incidents and described the process.[4] Gaisser asked the Plaintiff if he had questions, and Plaintiff replied, "No, sir." [Doc. 70-5 at 2]. Gaisser also described the incident and the charges that the panel would be reviewing, and read the descriptions of the charges from the Student Handbook. After that, the witness statements were distributed for the participants to read through. The Plaintiff spoke up to add comments, but never expressed that he did not understand the charges against him or the process. During the hearing, the Plaintiff described the incident that had occurred on January 31, 2019 in Dr. Chrane's class. He admitted to using the "c word" and telling K.H. that he was "tired of hearing [her] bullshit." [Id. at 10]. He further admitted that he had made the profane remark loudly enough to be heard by others. He denied mocking K.H. but stated that she "wasn't actually crying" and that he

---

[4] The hearing was recorded, and the Defendant has submitted that recording to the Court for review. [Doc. 80]. Additionally, the Defendant submitted a transcript of that hearing. [Doc. 70-5]. Although that transcript is not certified, the Court has compared the transcript to the recording and finds it to be an accurate representation of that recording.

felt had been disrespected by her. [Id. at 12]. The Plaintiff also admitted in the hearing to making off-topic statements in class, which Dr. Chrane had discussed with him, as well as vaping in class, which the Plaintiff stated Dr. Chrane "didn't mind."[5] [Id. at 13].

After the panel made its decision and Gaisser began reading it to the Plaintiff, he interrupted throughout and began criticizing the decision and the panel, with remarks such as, "That's outrageous," … "Why, is this as serious that it needs to be like this? What's the deal?" … "You know, what's crazy is it's such a double standard," and "Y'all don't give a shit about me, is that what this is about, like, how can y'all look at me and do this to me?" [Id. at 19]. He also downplayed his actions and continued to blame K.H., saying, "The girl was being rude to me, I let it slide. I asked her why she's being a cunt. And that's such a big deal? To ask a girl why she--?" [Id. at 20].

Despite the Plaintiff's outbursts, the panel managed to explain that:

> We made this decision because you are not taking this educational thing seriously. Your disruptiveness, your name calling, the things that you've done outside the classroom, whether it be the dining hall,

---

[5] Dr. Chrane later testified in her deposition that the Plaintiff 's vaping and other behaviors had truly disrupted her class and she regretted not addressing those issues sooner. [Doc. 69-11: Chrane Dep. 46, 69-70, 51-54, 136-37, 138-39]. Dr. Chrane also testified at her deposition that she believed the Plaintiff's conduct toward K.H. was inappropriate and unacceptable, no matter what caused him to use the word, and she thought he should be out of the classroom and off campus. [Id. at 79-81, 109, 138].

> whether it be in other classes, not just this specific
> one, you're not taking the education seriously.

[Id.].

The Plaintiff was found responsible for conduct that was detrimental to the learning environment, including wasting time in class by talking about off-topic subjects, vaping in class, and engaged in abusive and harassing language toward other students, including calling one student a "fag" and another student a "cunt." [Doc. 69-4: Gaisser Decl. at ¶ 21]. The panel decided to suspend the Plaintiff from enrollment, with his eligibility to re-enroll for the Fall 2019 semester conditioned on submitting a ten-page paper reflecting on his behavior and how he could avoid misconduct in the future. [Id.]. The Plaintiff never submitted the paper or applied for re-enrollment at LMC. Instead, the Plaintiff enrolled at Appalachian State University, where he made the Dean's List. [Doc. 80-2: Munday Decl. at ¶ 19].

## IV. DISCUSSION

The Plaintiff has alleged two violations of the ADA and Rehabilitation Act against LMC. First, he contends that he was excluded from LMC based on his disability. Second, he contends that LMC failed to make reasonable accommodations for his disability. The Court will address each of these claims in turn.

21

## A. Exclusion Claim

Title III of the ADA provides, in pertinent part, that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation . . . ." 42 U.S.C. § 12182(a).[6] As an undergraduate private school, LMC qualifies as a "public accommodation" under Title III of the ADA. The Rehabilitation Act precludes federal grantees from excluding, denying benefits to, or discriminating against any "otherwise qualified individual . . . solely by reason of her or his disability." 29 U.S.C. § 794(a). LMC is subject to the provisions of the Rehabilitation Act As the recipient of federal financial assistance.

Although they employ slightly different language, the ADA and the Rehabilitation Act "impose similar requirements" and "require a plaintiff to demonstrate the same elements to establish liability." <u>Halpern v. Wake</u>

---

[6] In 2008, Congress passed the ADA Amendments Act ("ADAAA"), which was intended to "reinstat[e] a broad scope of protection to be available under the ADA." Pub. L. No. 110-325, § 2(b)(1), 122 Stat. 3553 (2008). While preserving the ADA's definition of "disability," the ADAAA made it easier for plaintiffs to show that an impairment "substantially limits one or more major life activities." <u>See</u> 29 C.F.R. § 1630.2(j)(1)(i) (noting that the term "substantially limits" was not intended "to be a demanding standard"); §16302.(j)(1)(ii) (noting that an impairment "need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting"). For ease of reference, the Court will refer to the amended Act simply as "the ADA."

Forest Univ. Health Sciences, 669 F.3d 454, 461 (4th Cir. 2012).[7]  A disability

discrimination claim under either statute may be proven through direct

evidence or through the burden-shifting framework first articulated by the

Supreme Court in McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973).

See Raytheon Co. v. Hernandez, 540 U.S. 44, 49-50 & n.3 (2003).  "This

burden-shifting analysis requires the plaintiff first to establish, by a

preponderance of the evidence, a *prima facie* case of discrimination.  Once

a plaintiff meets that initial burden, the burden shifts to the defendant to show

that its decision was made 'for a legitimate, nondiscriminatory reason,' and

if that hurdle is crossed, then the presumption of discrimination is rebutted

and the burden returns to the plaintiff to prove that the university's proffered

reason was pretext for discrimination."  Neal v. East Carolina Univ., -- F. 4th

--, 2022 WL 16703136, at *1 (4th Cir. Nov. 4, 2022).

To establish a *prima facie* case for exclusion from an educational

program under either the ADA or the Rehabilitation Act, a plaintiff must show

that "(1) he has a disability, (2) he is otherwise qualified to participate in the

---

[7] As the Fourth Circuit noted in Halpern, the two statutes differ slightly with respect to the element of causation.  Under the ADA, a plaintiff must show that the disability was a "motivating cause" of the exclusion, whereas under the Rehabilitation Act, the plaintiff must establish that the exclusion occurred "solely by reason of" a disability.  Halpern, 669 F.3d at 461-62.

Case 1:20-cv-00105-MR-WCM   Document 83   Filed 11/28/22   Page 23 of 53

defendant's program, and (3) he was excluded from the program on the basis of his disability."  Halpern, 669 F.3d at 461 (citing Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 498 (4ᵗʰ Cir. 2005)) (footnote omitted).

### 1.    Disability

With respect to the first element of the *prima facie* case, a plaintiff may establish that he has a "disability" by demonstrating the existence of "a physical or mental impairment that substantially limits one or more major life activities of such individual."   29 U.S.C. § 705(9)(B); 42 U.S.C. § 12102(1)(A).[8]  In this context, "major life activities" are defined as including

---

[8] A plaintiff also may prove a "disability" by demonstrating that he has a "record of such impairment" or that he has been "regarded as having such an impairment."  29 U.S.C. § 705(9)(B); 42 U.S.C. § 12102(1)(B), (C).  An individual has a "record of a disability" where that individual "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities."  29 U.S.C. § 1630.2(k)(1).  An individual may be "regarded as" disabled when: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities."  Blackburn v. Trustees of Guilford Tech. Cmty. Coll., 733 F. Supp. 2d 659, 663 (M.D.N.C. 2010) (quoting Sutton v. United Air Lines, Inc., 527 U.S. 471, 489, (1999), superseded by statute, ADA Amendments Act of 2008, Pub. L. No. 110–325, 122 Stat. 3553).  The Plaintiff does not contend that he meets either of these definitions, nor could he.  The Plaintiff has not presented evidence of a documented record of any disability with LMC; to the contrary, it is undisputed that he failed to go through the necessary steps to present documentation and declare his disability as required by school policy.  Further, the Plaintiff does not contend that he was mistakenly regarded as having a disability when he, in fact, was not disabled.   Accordingly, the Court will limit its analysis to whether the Plaintiff has established that he has an actual impairment that substantially limits one or more major life activities.

such activities as "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

Here, the Plaintiff claims that he was discriminated on the basis of his disability of ADHD.[9] The Plaintiff attests in his Declaration that he was diagnosed with ADHD in 2005, at the age of seven. [Doc. 80-2: Munday Decl. at ¶ 5]. The Plaintiff, however, has not presented any competent medical evidence to establish this diagnosis. The Plaintiff submits a letter dated November 11, 2021, from Steven M. Sutherland, M.D., stating that Dr. Sutherland first saw the Plaintiff in 2014, and that the Plaintiff "was felt at that time to have Attention Deficit Hyperactivity Disorder – combined type." [Doc. 80-2: Munday Decl. Ex. 1]. This unauthenticated, unsworn document, however, is inadmissible at the summary judgment stage to prove that the

---

[9] In his Declaration, the Plaintiff refers to his having "ADHD, anxiety, and related challenges." [Doc. 80-2: Munday Decl. at ¶ 3]. However, the Plaintiff has not presented any forecast of evidence related to any separate diagnosis of anxiety or other "challenges" apart from his alleged ADHD diagnosis. Rather, it appears that he considers his anxiety to be a symptom of his ADHD. [See Doc. 80-3: W. Munday Decl. at ¶ 3 (noting that Plaintiff's ADHD "contributes to persistent worry and anxiety"); Doc. 80: Pltf. MSJ Response at 11 (referring to "ADHD and related syndromes such as anxiety")]. As such, the Court will consider the Plaintiff's alleged anxiety not as a separate disability but as part of his claimed ADHD condition.

Plaintiff in fact had been diagnosed with ADHD. See Edens v. Kennedy, 112 F. App'x 870, 879 (4th Cir. 2004) ("unsworn reports are inadmissible on summary judgment unless accompanied by affidavits or depositions swearing to their contents and conclusions").

In the course of discovery, the Plaintiff produced several documents identified as "medical records." However, none of the documents produced by the Plaintiff is admissible evidence establishing any kind of diagnosis. The first of these was an email sent by the Plaintiff's mother to herself with a list of providers and medications. [Doc. 70-4: Munday Dep. Exs. at 35]. The Plaintiff also produced two invoices from psychologist Raymond Mulligan, with clients listed as "Ellen Munday" and "Andrew Munday," for "professional services" valued at "$0" during one week in December 2016. [Id. at 37-38]. Additionally, the Plaintiff testified that he took Adderall while enrolled at LMC. [Doc. 69-7: Munday Dep. at 17]. However, the Plaintiff never produced any prescription records or medical records evidencing that he was receiving treatment for ADHD while at LMC.

While expert evidence is not always required to establish a disability, courts generally have required expert testimony when "a condition would be unfamiliar to a lay jury and only an expert could diagnose that condition." Mancini v. City of Providence, 909 F.3d 32, 41 (1st Cir. 2018); Felkins v. City

of Lakewood, 774 F.3d 647, 652 (10th Cir. 2014) (holding that expert evidence was required to prove plaintiff's condition of avascular necrosis and the impact of such condition on plaintiff's major life activities, "for those are clearly matters beyond the realm of common experience and require the special skill and knowledge of an expert witness") (internal quotation marks and citation omitted).  By contrast, if an impairment would be obvious to a jury, then courts have concluded that expert medical evidence is not required to satisfy this element.  See Marinelli v. City of Erie, Pa., 216 F.3d 354, 361 (3d Cir. 2000) (holding that plaintiff's failure to present medical evidence of his disability was not fatal to his claim as "arm and neck pain . . . are among those ailments that are the least technical in nature and are the most amenable to comprehension by a lay jury"); Katz v. City Metal Co., 87 F.3d 26, 31 (1st Cir. 1996) ("[W]e have no doubt that a rational jury could conclude, even without expert medical testimony, that [the plaintiff's heart attack was] a condition affecting the cardiovascular system and therefore that he had a physical impairment under the ADA.").  As the First Circuit explained in Mancini:

> A missing arm serves as an obvious example of an impairment that can be demonstrated without any supporting medical testimony.  That is not to say, though, that an impairment must be as apparent as the lack of a limb in order to render medical evidence

27

> unnecessary. . . . On a spectrum that ranges from missing limbs to rare medical infirmities, some conditions plainly fall within the universe of impairments that a lay jury can fathom without expert guidance. These conditions do not require medical evidence in an ADA case.

Mancini, 909 F.3d at 41-42 (internal citations omitted).

In the Court's view, a neurodevelopmental[10] condition such as ADHD does not fall within "the universe of impairments that a lay jury can fathom without expert guidance." See id. While most jurors may be familiar with the term "ADHD"—and indeed may know someone who has been diagnosed with that condition—determining whether a particular plaintiff, in fact, has ADHD, and the extent to which that condition impacts that particular plaintiff, are not matters that are readily susceptible to observation by a lay person. Rather, an evaluation by a medical professional is necessary to diagnose whether a person has ADHD and to determine the extent to which that person is affected by that condition. In fact, the term "ADHD" is now so commonly used among the lay population with regard to any inattentiveness that expert identification or diagnosis of the actual neurodevelopmental condition is necessary to make a *prima facie* showing of an actual disability

---

[10]See What is ADHD? | CDC, https://www.cdc.gov/ncbddd/adhd/facts.html (last accessed Nov. 22, 2022) (describing ADHD as a neurodevelopmental disorder).

28

based thereon. For this reason, absent competent medical evidence of an ADHD diagnosis, the Court concludes that the Plaintiff has failed to present a forecast of evidence from which a reasonable jury could conclude that he has an "impairment" within the meaning of the ADA.[11]

Even if the Plaintiff had presented competent evidence regarding his claimed impairment, the Plaintiff does not offer any competent medical evidence to establish how his ADHD substantially limits any of his major life activities.

The 2008 amendments to the ADA made clear that satisfying this evidentiary burden is not supposed to be difficult. See 29 C.F.R. § 1630.2(j)(1)(i) (noting that the term "substantially limits" was not intended "to be a demanding standard"). Nevertheless, the Plaintiff must present *some* competent evidence to demonstrate a substantial limitation. On this point,

---

[11] The Plaintiff attempts to excuse his lack of competent medical evidence by arguing that LMC was "well aware that Plaintiff had ADHD." [Doc. 80 at 13]. Mere awareness that the Plaintiff (and his parents) asserted that he has ADHD, or that he exhibited some symptoms thereof, however, does not substitute for evidence that would create a factual issue as to whether the Plaintiff, in fact, had an actual disability. Indeed, even if the Plaintiff were proceeding under a theory he was "regarded as" being disabled, evidence of LMC's awareness of his claimed impairment would not create a genuine issue as to this element. See Haulbrook v. Michelin N. Am., Inc., 252 F.3d 696, 703 (4th Cir. 2001) ("The fact that an employer is aware of an employee's impairment, without more, is insufficient to demonstrate either that the employer regarded the employee as disabled or that perception caused the adverse employment action.") (citation and internal quotation marks omitted).

the Plaintiff cites to a number of medical articles describing the behaviors and impairments associated with a diagnosis of ADHD. [See Doc. 80 at 12]. This type of hearsay, however, is inadmissible on summary judgment. See Edens, 112 F. App'x at 879. Moreover, determining whether an impairment substantially limits a major life activity "requires an individualized assessment." 29 C.F.R. § 1630.2(j)(iv). Thus, merely relying upon scholarly articles which discuss the wide array of symptoms that *may* be associated with ADHD does not demonstrate how *this particular Plaintiff* is substantially limited in his major life activities by his condition.

In an effort to establish how his ADHD impacts his major life activities, the Plaintiff relies upon the declaration of his father, who purports to opine about the Plaintiff's limitations stemming from his ADHD. [See Doc. 80-3: W. Munday Decl. at ¶ 3]. Specifically, Mr. Munday states that the Plaintiff

> is impaired in many major life functions by the executive functioning problems such as poor impulse control, mood swings, and difficulty focusing that he struggles with daily. Examples of major life activities in which he is impaired include: problems with maintaining meaningful relationships due to the numerous ADHD symptomatic behavior characteristics; problems with employment as employers expect one to be organized, attentive, focused, and to follow directions, all of which Andrew struggles with.

30

> To give some more concrete examples, Andrew's ADHD causes him difficulty with establishing normal sleeping habits; erratic sleeping patterns often leave him tired and irritable. He has trouble meeting deadlines, as reflected in some of his professors' comments, because ADHD causes forgetfulness and trouble with time management. In every facet of life activities, ADHD creates emotional challenges and struggles to control one's behavior. ADHD contributes to persistent worry and anxiety. As in Andrew's case, ADHD sufferers often have emotional outbursts and lash out if annoyed or impatient, as Andrew did in the cafeteria and in Spanish Class.

[Id.]. As can be seen by this excerpt, Mr. Munday's opinions go far beyond his personal observations of his son's conduct and behaviors. The behaviors he cites would generally be said to be descriptive of college-age students. However, he proceeds to make sweeping generalizations about the common symptoms and consequences of ADHD. He then attempts to draw a causal connection between a number of his son's behaviors and his claimed condition. While Mr. Munday may be competent to testify about his observations of his son's behavior, such as erratic sleep patterns, lack of organization or difficulty in maintaining relationships,[12] he lacks the expertise to conclude that these behaviors are a manifestation of a

---

[12] It is undisputed that LMC's actions were not based on the Plaintiff's erratic sleep habits, lack of organization or difficulty in maintaining relationships, but rather based on the Plaintiff's misconduct.

neurodevelopmental disorder such as ADHD, and not because of some other condition that causes anger management issues, such as oppositional defiant disorder. A layperson's personal medical opinions are incompetent and inadmissible on summary judgment. See Mallon v. Frostburg State Univ., No. BPG-19-795, 2021 WL 4215331, at *7 (D. Md. Sept. 15, 2021). Because the Plaintiff has not offered any competent medical evidence to establish that he has ADHD or that this impairment substantially limits any of his major life activities, the Court concludes that the Plaintiff has failed to present a forecast of evidence from which a reasonable jury could conclude that he is "disabled" within the meaning of the ADA or the Rehabilitation Act.

## 2. Qualified

Even if the Plaintiff had presented a sufficient forecast of evidence to establish that he has a disability, he must also demonstrate that he was "qualified" to participate in LMC's undergraduate degree program. A plaintiff is "qualified" if he is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). Therefore, to prove that he is "qualified," the Plaintiff must show "(1) that he could satisfy the essential eligibility requirements of the program, i.e., those

requirements that bear more than a marginal relationship to the [program] at issue, and (2) if not, whether any reasonable accommodation by the defendant would enable the plaintiff to meet these requirements." Halpern, 669 F.3d at 462 (citation, internal quotation marks, and footnote omitted).[13]

Recognizing that "courts are ill-suited to the task of determining the essential eligibility requirements of an academic program," courts within the Fourth Circuit "traditionally afford great deference to a school's determination of the qualifications for its programs." Neal, 2022 WL 16703136, at *10; see also Halpern, 669 F.3d at 463 ("Because we are likewise at a comparative disadvantage in determining whether Halpern is qualified to continue in the Doctor of Medicine program and whether his proposed accommodations would effect substantial modifications to the Medical School's program, we accord great respect to Wake Forest's professional judgments on these issues.") (citation and internal quotation marks omitted). In affording such deference, however, the Court must carefully review the record to ensure

---

[13] The Plaintiff contends that a student is "not qualified" to participate in an academic program only if that student poses a direct threat to the health and safety of others. [Doc. 80 at 16]. The Plaintiff does not cite any Supreme Court or Fourth Circuit authority for this argument. Rather, the Plaintiff cites Onishea v. Hopper, 171 F.3d 1289 (11th Cir. 1999). In that case, the Eleventh Circuit held that, under the Rehabilitation Act, a person who poses a significant risk of communicating an infectious disease to others in the workplace is not "otherwise qualified" for his or her position if a reasonable accommodation cannot eliminate that risk. Id. at 1296-97. Onishea, therefore, is entirely distinguishable and has no application to the present case.

33

that "the educational institution has conscientiously carried out its statutory obligation to provide reasonable accommodations to persons with disabilities" and not permit a school's academic decisions "to disguise truly discriminatory requirements." Halpern, 669 F.3d at 463 (citations and internal quotation marks omitted).

With this deferential standard in mind, the Court now examines the requirements of LMC's academic program in order to determine whether, with or without a reasonable accommodation, the Plaintiff could satisfy those requirements. According to the LMC Student Handbook, the hallmarks of LMC students are "academic achievement, professional skills and concern for humanity." [Doc. 69-4: Gaisser Decl. Ex. B: 2018-19 Student Handbook at 6]. All students are expected to act in a manner that does not infringe upon the rights and responsibilities of others, including by refraining from disruptive classroom behavior, and students are expected to maintain a high standard of conduct both on and off campus. These requirements "bear more than a marginal relationship" to LMC's academic mission. Ensuring that students do not infringe upon the rights of other students and that they refrain from engaging in disruptive classroom behavior is essential to creating a positive and productive learning environment for all students.

Such requirements are necessary, as a school cannot allow one disruptive student to impede the education of others.

While the Plaintiff may have been academically qualified, the undisputed forecast of evidence demonstrates that he failed to meet the basic standard of conduct required by undergraduate students at LMC. The Plaintiff had an ongoing pattern of conduct violations and abusive behavior beginning in his first semester, including entering a residence hall without authorization (November 2017); refusing to follow the rules of the cafeteria and swearing at staff who attempted to enforce them (January and February 2018); breaking a bathroom sink and, when confronted, accusing staff of lying and trying to scam him out of money (April 2018); calling a hallmate a "fag" for reporting him as the one who broke the sink (April 2018); screaming at staff, the Assistant Dean, and the Dean of Students for charging him for damaging a rental textbook (May 2018); vaping and being disruptive in the classroom (Fall 2018 and Spring 2019); and finally, calling a female classmate a "cunt" in class, berating her for being upset about it, and refusing to apologize in a way that did not blame the classmate (January 2019).

The Plaintiff attempts to diminish this misconduct, arguing that these incidents were merely "insignificant dust-ups and conflicts that are to be expected among maturing college students" and that his behavior was, at

35

most, a "minor disruption." [Doc. 80 at 16, 17]. While the Court is obligated to view the evidence in the light most favorable to the Plaintiff and to draw all reasonable inferences in his favor at this stage, characterizing the Plaintiff's misconduct as "insignificant dust-ups" and typical "conflicts" among college students is not a reasonable inference to be drawn in this case. Even viewing the evidence in the light most favorable to the Plaintiff, his emotional outbursts, name-calling, and other disruptive conduct are serious incidents that go far beyond the conduct exhibited by the typical college student. LMC's concern and reaction are not mere "pearl-clutching over epithets," as the Plaintiff characterizes it. [Doc. 80 at 17].

The Plaintiff also argues that the fact that he is now attending another university and performing well academically is evidence that he is, in fact, "qualified" to be an undergraduate student and therefore could have participated in the LMC program with reasonable accommodations. The Court, however, views this evidence more as suggesting that the Plaintiff's emotional outbursts and disruptive conduct do not arise from any immutable neurodevelopmental disability but rather from a lack of self-control, and that the Plaintiff, having suffered adverse consequences as a result of his violent and disruptive behavior at LMC, learned to control his emotions and improve

his communication skills, thereby enabling him to succeed in another academic program.

Having determined that the Plaintiff's behavior rendered him unqualified to participate in the undergraduate program at LMC, the Court must consider whether there was a reasonable accommodation available by which the Plaintiff could have become qualified. "Federal law mandates that federal grantees and public accommodations make 'reasonable,' but not 'substantial' or 'fundamental,' modifications to accommodate persons with disabilities." Halpern, 669 F.3d at 464. "Although determination of the reasonableness of a proposed modification is often fact-specific, a court may grant summary judgment in favor of a defendant if the plaintiff fails to present evidence from which a jury may infer that the accommodation is 'reasonable on its face, i.e., ordinarily or in the run of cases,' or if the defendant establishes as a matter of law that the proposed modification will cause 'undue hardship in the particular circumstances.'" Id. (quoting in part U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 401-02 (2002).

The Plaintiff does not specifically address what reasonable accommodations were necessary in order to address his behavioral issues. However, in the context of his failure-to-accommodate claim, he identifies two specific accommodations which he claims he requested and was denied

37

by LMC. First, he points to the fact that he requested Gaisser to intervene on his behalf with the cafeteria staff regarding his dispute about taking food from the cafeteria. Second, he cites his request to Gaisser for more time and assistance in preparing for his disciplinary hearing as well as having certain witnesses testify on his behalf. These "accommodations," however, have no apparent relation to the Plaintiff's claimed disability, particularly since the Plaintiff had not provided any notice to LMC of behavioral issues arising from ADHD when specifically given the opportunity to do so. Moreover, these accommodations fail to address the underlying issue—the Plaintiff's repeated outbursts and disrespectful conduct toward cafeteria staff, as well as other students. These proposed accommodations would have done nothing to help the Plaintiff avoid committing such misconduct in the future. "A school, if informed that a student has a disability with behavioral manifestations, may be obligated to make accommodations to help the student avoid engaging in misconduct. But, the law does not require the school to ignore misconduct that has occurred because the student subsequently asserts it was the result of a disability." Halpern, 669 F.3d at 465.

The Plaintiff does not identify any other accommodation that would have rendered him "qualified" other than to suggest that his behavioral

problems could have been addressed by LMC staff and faculty sitting down and talking with him when he had an emotional outburst or experienced difficulty in communicating respectfully. This proposed accommodation, however, is unreasonable on its face for a number of reasons. First and foremost, the Plaintiff never made a request for an accommodation of any behavioral challenges stemming from his ADHD. For example, while the Plaintiff asked for Gaisser to intervene on his behalf[14] in the situation involving the cafeteria manager, it is undisputed that the Plaintiff never requested such an intervention as a disability accommodation. Neither the Plaintiff nor his father identified anger management or other behavioral issues as symptoms of ADHD that required accommodations by the school. While the Plaintiff's father informally advised various staff and faculty that the Plaintiff had ADHD, this was done in the context of requesting changes in his grades or opportunities for extra credit or making up missed work when the Plaintiff missed assignments or tests. Similarly, the Plaintiff claims that he requested accommodations, but only in the form of extensions of time to complete assignments.

_____

[14] It is not clear when kind of "intervention" that the Plaintiff sought, other than for Gaisser to direct the cafeteria staff to allow the Plaintiff to use the cafeteria as he wished.

In response to these requests for academic accommodations, the Plaintiff and his father were repeatedly advised that the Plaintiff needed to declare his disability and request specific accommodations through Disability Services, a process which the Plaintiff simply would not follow. LMC was not obligated to accommodate any alleged behavioral issues stemming from the Plaintiff's ADHD until he had "provided a proper diagnosis ... and requested specific accommodation."[15] <u>Kaltenberger v. Ohio College of Podiatric Medicine</u>, 162 F.3d 432, 437 (6th Cir. 1998).

Moreover, the Plaintiff's proposed accommodation is simply not feasible. Educators, particularly at the college level, cannot be expected to suspend their instruction every time a student is disruptive in order to "sit down and talk" with a student who is being continuously disruptive in their class. If a modification "either imposes undue financial and administrative burdens . . . or requires a fundamental alteration in the nature of the program," it is not a "reasonable" modification. <u>Sch. Bd. of Nassau Cty., Fl. v. Arline</u>, 480 U.S. 273, 287 n.17 (1987) (citation omitted). The Plaintiff's

---

[15] The Plaintiff asserts that he is otherwise qualified, as shown by his performance at his new university. The Plaintiff has submitted nothing, however, to indicate that his improved behavior at this university is the result of accommodations being provided to him. The Court is left to wonder whether the Plaintiff has simply matured enough to learn how to control his temper and disruptive behavior.

40

proposed "accommodation" is not only an unreasonable burden on the teachers; it deprives the other students of their opportunity to learn, thereby fundamentally altering LMC's academic program. See PGA Tour, Inc. v. Martin, 532 U.S. 661, 682-83 (2001) (stating that if proposed accommodation alters "an essential aspect" of the program, that would constitute a "fundamental alteration" of the program and, therefore, is per se unreasonable).[16]

For all of these reasons, the Court concludes that the Plaintiff has failed to present a forecast of evidence from which a jury could reasonably conclude that he was "otherwise qualified" to be enrolled as an LMC student, with or without reasonable accommodations.

### 3. Excluded On The Basis of Disability

Even if the Plaintiff could satisfy the first two elements of his prima facie case, he would also have to demonstrate that he was excluded from LMC "on the basis of" his disability. To satisfy this element under the ADA, a plaintiff must show that the disability was a "motivating cause" of the exclusion, whereas under the Rehabilitation Act, the plaintiff must establish that the exclusion occurred "solely by reason of" a disability. Halpern, 669

_____

[16] Similarly, cafeteria staff cannot be expected to allow a student to disregard cafeteria rules in order to keep that student from having violent outbursts.

F.3d at 461-62.  Under either standard, establishing causation requires more than "the fact that the defendant is aware of the plaintiff's impairment"; rather, "a plaintiff must show that the adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination."  Neal, 2022 WL 16703136, at *13 (citations and internal quotation marks omitted).

Here, the undisputed forecast of evidence makes clear that the basis for the Plaintiff's suspension from school was his pattern of misconduct, not a disability or his requests for accommodations for any disability.  First and foremost, as discussed *supra*, the Plaintiff never requested an accommodation for behavioral symptoms related to ADHD.  Further, as was explained to the Plaintiff in his disciplinary hearing, the Plaintiff's history of misbehavior led the members of the disciplinary panel to conclude that the Plaintiff was not taking his education seriously, and that a suspension was appropriate in order to provide the Plaintiff with an opportunity to reflect upon his behavior and to devise solutions to avoid such issues in the future.  Although the Plaintiff argues that his misconduct was the result of his ADHD, that neither excuses his behavior nor renders LMC's decision to suspend him discriminatory.  "[W]hile the ADA prohibits a university from dismissing a student on account of a disability, a university is lawfully permitted to dismiss a student on account of misconduct triggered by disability."  Neal,

42

2022 WL 16703136, at *13.  Therefore, even if the Plaintiff had presented a forecast of evidence that he has a disability which has behavioral manifestations, the Court, affording appropriate deference to the academic decisions of LMC, must conclude that the Plaintiff has failed to present a prima facie case that he was excluded from LMC on the basis of a disability.

Although the Plaintiff failed to properly declare his ADHD diagnosis and never sought accommodations for behavioral manifestations of his disability, LMC nevertheless made significant efforts during the Plaintiff's enrollment in an effort to help him succeed as a student.  The Plaintiff received academic assistance from his guidance counselor, who helped him schedule his classes, and he received assistance with his assignments from the Burton Center for Student Success.  Even though he never made any formal request for accommodations, the Coordinator of Disability Services reached out to the Plaintiff and attempted to schedule a meeting to discuss his needs, but the Plaintiff did not cooperate.

Even with regard to his behavioral issues, the Plaintiff was given multiple warnings and citations in an attempt to correct his behavior.  In some instances, such as his angry outburst at being asked to pay for a damaged rental textbook, he was not disciplined at all.  The record of LMC's attempts to address the Plaintiff's issues lacks any indicia that the Plaintiff was

43

suspended from LMC on the basis of his disability. Despite these efforts, the Plaintiff persisted in engaging in misconduct – disrupting class with off-topic comments, vaping in class, kicking doors and getting in screaming matches with cafeteria staff, and verbally assaulting fellow students. "[M]isconduct—even misconduct related to a disability—is not itself a disability" and may be a basis for dismissal. Martinson v. Kinney Shoe Corp., 104 F.3d 683, 686 n. 3 (4th Cir.1997); Halpern, 660 F.3d at 465.

The lack of discriminatory intent is also evident from the fact that, although LMC reserved "the right to dismiss any student who proves to be a detriment to the welfare of the College and surrounding community" [Doc. 69-4: Gaisser Decl. Ex. B at 9], LMC did not expel the Plaintiff for his misconduct. Instead, LMC suspended the Plaintiff for the remainder of the spring semester and provided him the opportunity to re-enroll for the following fall semester upon submission of a ten-page paper reflecting on his behavior and how he could avoid misconduct in the future. The short length of the Plaintiff's suspension and the fact that LMC was willing to allow the Plaintiff to return under such relatively easy conditions belie any intent to discriminate or otherwise retaliate against the Plaintiff.

For all of these reasons, the Court concludes that the Plaintiff has failed to present a forecast of evidence from which a jury could reasonably

conclude that he was excluded from LMC's undergraduate program on the basis of his disability.

Even if the Plaintiff could establish a *prima facie* case of disability discrimination, the Plaintiff's ADA and Rehabilitation Act claims fail because LMC has presented a legitimate, non-discriminatory reason for his suspension, namely, his disruptive and offensive conduct during his two years as a student at LMC. LMC's decision to suspend the Plaintiff for his repeated misconduct is a determination that is entitled to a great degree of deference. See Halpern, 669 F.3d at 463; Herzog v. Loyola College in Maryland, Inc., No. RDB-07-02416, 2009 WL 3271246, at *8 (D. Md. Oct. 9, 2009) ("It is well within [a college's] discretion to dismiss a student who has problems with authority, difficulty understanding the impact of his conduct on others and who has conceded to breaching ethical standards promulgated by the school.").

Further, the Plaintiff has failed to present a forecast of evidence that LMC's reason for dismissing him was a pretext for discrimination. In order to show pretext, the Plaintiff must demonstrate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [Defendant's] proffered legitimate reasons for its action that a reasonable factfinder could

rationally find them unworthy of credence." <u>Mallon</u>, 2021 WL 4215331, at *10 (citations omitted).

As evidence of pretext, the Plaintiff cites to an "admission" from Gaisser that he "exclu[ded] favorable items from Andrew's student file in advance of the February 2019 disciplinary hearing." [<u>See</u> Doc. 80 at 20]. This argument, however, mischaracterizes Gaisser's testimony and the nature of the items that were excluded from the Plaintiff's file, namely, emails from the Plaintiff's professors. The emails, read by Gaisser during his deposition, sought "feedback from any professors about Andrew Munday's behavior in class," and described "behavior problems," making up excuses to leave class, constantly texting in class, and consistently distracting other students. [Doc. 69-10: Gaisser Dep. 82-83, 84]. No reasonable jury could find that Gaisser's decision to exclude complaints about the Plaintiff's in-classroom behavior problems from the hearing supports a finding of pretext in the panel's decision to suspend the Plaintiff for misconduct.[17]

In sum, the Court concludes that the Plaintiff has failed to present evidence from which a reasonable jury could conclude that he was excluded from LMC's academic program on the basis of a disability. Accordingly, the

_____

[17] Even if the emails had been positive in nature, however, they fail to support a finding that the panel's decision to suspend the Plaintiff for his misconduct was pretextual.

Plaintiff's exclusion claims under the ADA and the Rehabilitation Act must be dismissed.

### B.  Failure to Accommodate

To establish a *prima facie* case of a failure-to-accommodate claim under the ADA and the Rehabilitation Act, the Plaintiff must show that (1) he has a disability; (2) LMC knew of his disability; (3) he was qualified to participate in LMC's program, with reasonable accommodations; and (4) LMC refused to make any reasonable accommodation.  See Reyazuddin v. Montgomery Cty., Md., 789 F.3d 407, 413-14 (4th Cir. 2015) (discussing ADA and the Rehabilitation Act in the employment context).

For the reasons stated above with respect to the Plaintiff's exclusion claim, the Court concludes that the Plaintiff has failed to present a forecast of evidence from which a reasonable jury could conclude that he was disabled or that he was qualified to participate as an undergraduate student, with or without a reasonable accommodation.  On this basis alone, the Plaintiff's failure-to-accommodate claim fails.

Even if the Plaintiff had presented a sufficient forecast as to whether he has a disability and whether he was qualified, the Court finds that he has failed to present a forecast of evidence regarding the other elements of his *prima facie* case.  The ADA regulations provide that, in determining an

appropriate reasonable accommodation, "it may be necessary for the covered entity to initiate an informal, interactive process" with the disabled individual in order to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). In the employment context, the Fourth Circuit has held that the duty to engage in this interactive process "is generally triggered when an employee communicates to his employer his disability and his desire for an accommodation for that disability." Wilson v. Dollar Gen. Corp., 717 F.3d 337, 346-47 (4ᵗʰ Cir. 2013).

Here, the Plaintiff at most has presented a forecast of evidence that the faculty and administration at LMC were "aware" that the Plaintiff had asserted that he had ADHD requiring some academic accommodations, such as extra time to complete assignments. The Plaintiff has failed to adduce any evidence that LMC was on notice that the Plaintiff required behavioral accommodations due to such ADHD in order to refrain from engaging in abusive, inappropriate behavior that violated the Code of Conduct. The Plaintiff has the burden of demonstrating that LMC "was on notice of his disability *and* the limitations it imposes." Joseph M. v. Becker College, 531 F. Supp.3d 383, 398 (D. Mass. 2021). While the record is replete of examples of the Plaintiff's disruptive conduct, there is no indication

48

that the Plaintiff was willing to take any steps to improve his behavior, in or out of the classroom, any suggestions of what such steps would be, or that the Plaintiff requested those steps from LMC.

The Plaintiff contends that his outbursts and other acts of misconduct "were prototypical manifestations of ADHD." [Doc. 80 at 11]. On this point, the case of Joseph M. is instructive. In that case, the plaintiff, who had been diagnosed with Asberger's Syndrome (which is now more commonly referred as "Autism Spectrum Disorder"), was expelled from Becker College ("Becker") due to incidents of verbal abuse, violent and endangering behavior, and other misconduct. Id. at 385, 388. The plaintiff alleged that Becker violated the Rehabilitation Act by failing to provide him with reasonable accommodations regarding his deficient social skills and other difficulties with communication. Id. at 398. The district court granted Becker summary judgment on the plaintiff's claim, noting that the plaintiff had "*never* made any express requests . . . for accommodations which were not related to his academic performance." Id. As the district court explained:

> This is not a situation where the plaintiff's need for accommodations was obvious. While Becker was aware of Joseph's Asperger's diagnosis, that in and of itself is not sufficient to put Becker on notice that Joseph had difficulties socially interacting and communicating with others. Moreover, even after it became clear that Joseph was having difficulty with

his assignments, neither he nor his parents raised any issues regarding his ability to interact socially with other students or generally within the Becker community. Moreover, Becker made Joseph and his parents aware of support systems offered on campus . . . Joseph did not avail himself of these opportunities. Under the circumstances, it was incumbent upon Joseph to ask for any accommodations outside of the academic context. Because Joseph never requested any accommodations regarding his inability to socialize, his claim fails.

Id. at 398.

Like the situation in Joseph M., the Plaintiff's need for accommodations related to his social interactions and communication with others was not obvious. While LMC was aware that the Plaintiff asserted that he had ADHD, that alone was not sufficient to apprise the college of the Plaintiff's apparent need for accommodations relating to his social interactions. Despite being told repeatedly of the services available on campus, neither the Plaintiff nor his father sought such services. The only accommodations requested specifically in connection with any claimed ADHD (and only then by the Plaintiff's father) related to his academic work. Like the plaintiff in Joseph M., the Plaintiff never requested any accommodations regarding any of his alleged social difficulties.

The Plaintiff claims that LMC failed to accommodate his disability with respect to the February 6, 2019 disciplinary hearing by failing to accommodate the Plaintiff's request for "an explanation of what was going on," his request for additional time and assistance in preparing, and his request to have Dr. Chrane attend the hearing as a witness.

The Plaintiff's claim that he requested additional time to prepare for the hearing due to his disability is not supported by the evidence in the record. Although the Plaintiff testified that he requested a delay in the hearing from Gaisser, it is undisputed that he did not tell Gaisser that his request was in connection with ADHD. Additionally, the record evidence demonstrates that the Plaintiff did not request any witnesses attend the hearing as an accommodation. The Plaintiff admitted that he did not recall whether he asked Dr. Chrane to be present at the hearing, and Dr. Chrane likewise testified that she had received no such request from Plaintiff or his father. Even if Dr. Chrane had been present, there is no evidence that her testimony would have kept the Plaintiff from being suspended. Dr. Chrane herself testified at her deposition that she believed the Plaintiff's conduct was inappropriate and unacceptable, no matter what caused him to use the word, and she thought he should be out of the classroom and off campus

As for the Plaintiff's request for an explanation about the hearing, the Plaintiff cannot show that he requested any changes to the hearing procedures as an accommodation for ADHD. Even if he had, however, the undisputed evidence shows that the notice of hearing that the Plaintiff received by email and in physical form referred the Plaintiff to Gaisser and the Student Handbook with any questions about hearing procedures. This hearing was the Plaintiff's third hearing (and his second hearing with a panel) that the Plaintiff had gone through at LMC, and thus the Plaintiff already had had many opportunities to familiarize himself with hearing procedures. Further, the recording of the hearing indicates that the Plaintiff never expressed that he did not understand the charges against him or the process.

In short, the Plaintiff refused to follow LMC's procedures to declare a disability and request accommodations for behavioral issues stemming from his alleged ADHD. Further, the Plaintiff did not propose—and still has yet to propose—any reasonable accommodation that would have allowed him to become qualified to participate in LMC's undergraduate program. For all these reasons, the Court concludes that the Plaintiff has failed to present a forecast of evidence from which a reasonable jury could conclude that LMC failed to his accommodate an impairment that substantially limited one or

more of his major life activities.  Accordingly, the Plaintiff's failure-to-accommodate claims are also dismissed.

## ORDER

**IT IS, THEREFORE, ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 69] is **GRANTED**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED**.  A Judgment consistent with this Memorandum of Decision and Order shall be entered simultaneously herewith.

**IT IS SO ORDERED**.

Signed: November 28, 2022

Martin Reidinger
Chief United States District Judge